## THE C. D. GAMMON COMPANY, Appellee, *vs.* THE STANDARD TRUST AND SAVINGS BANK, Trustee, *et al.* Appellants.

*Opinion filed October 22, 1927—Rehearing denied Dec. 14, 1927.*

1. SPECIFIC PERFORMANCE—*when contract for erection and leasing of building cannot be specifically enforced—zoning.* A contract for the erection and leasing of a building cannot be specifically enforced by the intended lessee where it calls for the construction of a building in violation of the terms of a zoning ordinance, as the complainant is presumed to know of the provisions of the ordinance, which were in force when the contract was made, and he cannot compel the owner, or his trustee in charge of the erection of the building, to procure or attempt to procure an amendment of the ordinance so as to permit the construction and use of the building for the purpose intended, where the contract makes no such requirement.

2. SAME—*general rule as to when contract will be specifically enforced.* To enforce specific performance there must be a legal contract, clear, unambiguous and complete in its terms, which must be clearly proved; and although granting or refusing relief is a matter of discretion, to be exercised by the court with reference to equitable considerations incident to each case, where the contract is fair and valid, and expresses the terms agreed upon, relief will be awarded as a matter of right.

APPEAL from the Superior Court of Cook county; the Hon. WALTER P. STEFFEN, Judge, presiding.

CASTLE, WILLIAMS, LONG & CASTLE, and AUGUSTINE L. SCHAF, for appellants.

WYMAN, HOPKINS, MCKEEVER & COLBERT, (AUSTIN L. WYMAN, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

This appeal is from a decree in favor of appellee, the C. D. Gammon Company, for the specific performance of a contract for the erection and leasing of a building, with an option to buy it at any time during the term of the

lease. The Standard Trust and Savings Bank, as trustee, held the title to the property for the beneficial owner, F. J. Lewis. The contract was entered into by the trust and savings bank and the Gammon Company on August 1, 1924. The real estate has a frontage of 292 feet on Blue Island avenue and extends back 100 feet to an alley. By the original contract the bank, as trustee, agreed to erect a garage building on the premises, together with a stable intended to stable about seventy horses, and agreed to lease the garage building and stable, when completed, to appellee for ten years, with the option to purchase the premises within that period for $98,700. Appellee was engaged in the cartage and hauling business, in which it used both motor vehicles and horses. The only specifications for the building were those set forth in the contract, which also referred to certain blue-prints. The stable equipment was to include a suitable manure box in the alley, a wooden floor, water troughs, suitable partitions for separating the horses, a manger for each stall, hay and oat bins, etc., the cost of which in excess of $2000 to be paid by appellee. The contract provided that necessary changes to comply with the city ordinances should be permitted to be made. It provided that the building should be suitable "for the garage, draying, motor delivery, cartage, hauling and livery business" of appellee, substantially in conformity with the blue-prints referred to. The building was to be ready for occupancy by October 1, 1924. It was constructed under the supervision of F. J. Lewis, the beneficial owner. There were disagreements and controversies about the construction while it was going on and delay in its completion. An agreement was finally reached that the term of the lease should not begin until March 1, 1925, and that appellee should pay as its share of the cost of construction $5000 and was to take the building as it then was and make such alterations or additions as it saw fit, at its own expense. The trustee bank contended that under the settlement

agreement appellee was to do whatever might be necessary to comply with the city ordinances, and a provision in a written lease to that effect was prepared. Each party prepared modifications of the original contract to be signed, but neither of them would sign the lease prepared by the other. The bill was filed by appellee on July 7, 1925. After answers filed by appellants, and cross-bills by appellants Edward H. Thomas and the Hines Lumber Company to quiet their title against the claims of appellee, the cause was referred to a master in chancery to take the testimony and report his conclusions of law and fact. The master, after hearing the testimony, reported as his conclusions of law that the contract of August 1, 1924, was legal and binding and not in contravention of law; that the assumption of liability by appellee of compliance with the city ordinances insisted upon by appellants would place upon appellee obligations not imposed by the contract, and that the rights and interests of appellants in possession of the premises were subject to appellee's rights under the contract. The master recommended a decree for specific performance of the contract and that the cross-bills be dismissed for want of equity. The master's report was approved and a decree entered in accordance with the report and recommendations.

Pursuant to the Zoning statute of 1921 and an ordinance of May, 1923, the city of Chicago created a zoning board of appeals. The zoning statute gave the board of appeals power to recommend to the council changes or amendments of ordinances desirable, but the changes or amendments were required to be made by the adoption of an ordinance by the city. It is not contended that there were any variations or changes, made pursuant to the act of 1921, authorizing the construction on the premises of buildings for stabling more than eight horses. There is no question that the contract called for the construction of a building which violated the zoning ordinance. Appellee does not deny the contract called for the construction of a

building with accommodations for approximately seventy horses, and contends that it had no knowledge appellants intended to or sought to violate the ordinance; that the statute and ordinance provided for variations or amendments to the ordinance, and that it was the duty of appellants to secure permission to lawfully erect the building contracted for. The only ordinance in the record, as we understand, is the ordinance adopted in May, 1923, pursuant to the Zoning statute enacted in 1921. As we have before said, that statute provided that variations or amendments to the ordinance, in cases of particular hardship, might be made upon the recommendation of the board of appeals, but the amendments were required to be made by ordinance. No ordinance was ever adopted modifying or varying the zoning ordinance so as to permit a building on the premises involved, for the stabling of more than eight horses. The Zoning statute was amended in 1923, and the amendments became effective on July 1 of that year. As amended the statute provided that the city council "may provide for the appointment of a board of appeals consisting of five members," and defined their powers. Power was conferred on the board of appeals, in cases of practical difficulty or unusual hardship, to make variations in the ordinance, but did not require that the variations be made by the enactment of an ordinance by the city. The language of the Zoning statute of 1923 does not make it obligatory upon the council to provide for the appointment of a board of appeals, as did the 1921 act, but the language is, the city council "may provide" for the appointment of a board of appeals. The act of 1923 also provides that "every board of appeals heretofore appointed pursuant to the act of which this section is amendatory is hereby abolished." It does not appear from the record that the city council provided for the appointment of a board of appeals after the 1923 statute went into effect, which abolished all previous boards. It is asserted in appellants' brief that the

city had not acted in the appointment of a zoning board of appeals since the board appointed under the authority of the 1921 Zoning statute has been abolished or in such time as could affect the question here involved.

There is irreconcilable conflict in the evidence of the respective parties as to whether appellee knew no permission had been obtained to construct a building to stable more than eight horses. Appellee contends appellants knew all the time that the ordinance was being violated and concealed the fact from appellee; that appellee did not know such permission had not been obtained, and had a right to rely upon appellants constructing a building not in violation of law. The contract called for the construction of a building on the premises which violated the zoning ordinance. Both parties must be presumed to have known of the existence of the ordinance. (*Mason* v. *City of Shawneetown,* 77 Ill. 533; *Mather* v. *City of Ottawa,* 114 id. 659; *Hope* v. *City of Alton,* 214 id. 102.) Both parties offered considerable testimony upon the question whether appellee did know that permission had not been obtained to vary the ordinance so that there would be no violation in constructing the building so as to stable more than eight horses. The testimony on this subject is highly conflicting.

At the time the settlement was agreed upon during the progress of the construction of the building, appellee had disposed of many of its horses, was getting rid of all of them, and did not intend, after 1926, to use the premises as a stable in violation of the ordinance. Appellee was notified in January, 1925, that the building was completed. It examined the building and notified appellants of numerous defects, and the parties agreed upon terms upon which appellee would take the building as it then was, after certain changes were made, the lease to begin March 1, 1925, instead of October 1, 1924, and extend ten years, and should be entered into in accordance with the terms of the August 1, 1924, contract as modified. Appellee prepared a

lease which it claims was in conformity with the contract of August 1, 1924, but the master reported appellants refused to sign it unless it contained a provision "that the lessee make all alterations necessary to comply with the city of Chicago ordinances," and that appellee refused to sign the lease containing said provision. Appellants had a lease prepared about the same time which contained the provision, "the lessee hereby assuming full responsibility for all features of building, type, use and construction, if any, which do not comply with the city ordinances of the city of Chicago, and agrees that it will at its own expense make necessary changes, if any, at direction of proper public officers." Appellee refused to sign the lease with that clause in it. Some interviews and correspondence took place between the parties, and on April 2, 1925, appellants by letter notified appellee that unless the August 1 agreement was complied with by appellee within three days appellants would be compelled to take steps in the matter which they deemed advisable. April 23 of the same year the trustee bank wrote appellee that a letter of April 9 to the bank had been turned over to Schaf, who is the personal attorney of F. J. Lewis and solicitor for Edward H. Thomas and the Edward Hines Lumber Company in this case, that a lease had been prepared and presented, and that unless executed on or before Monday, April 27, "we shall consider ourselves excused because performance is prevented by you." On April 13 appellee sent the trustee bank a list of its objections. The settlement agreement had been arrived at during February or March, 1925. On the 5th day of June, 1925, the trustee bank conveyed the property to Edward H. Thomas, an officer of the Edward Hines Lumber Company, for the lumber company's use. The lumber company went into possession of the premises, and the decree finds that its rights were acquired with knowledge and notice of the rights of appellee under the contract.

The master reported that about August, 1924, appellee was supplanting its horse-drawn vehicles with motor trucks and disposing of the horses; that by the end of 1926 it expected to have no horses for use in its business; that it has been ready, able and willing to carry out the agreement since October, 1924, but that the trustee bank has failed and refused to carry it out.

The only written contract entered into by the parties was that of August 1, 1924. That contract called for the construction of a building in violation of the provision of the zoning ordinance forbidding the stabling of more than eight horses where the building was erected. The settlement agreement between the parties in February or March, 1925, was never signed, because each party insisted on conditions being incorporated in it which the other refused to sign. It is not sought by the bill to enforce the performance of any contract except that of August 1, 1924, as that was the only written agreement. Appellee contends it did not know appellants intended to violate the zoning ordinance; that it had a right to assume appellants would secure the necessary amendments or variations of the zoning ordinance to permit the construction of the building as agreed, and that the 1923 Zoning statute controls over the 1923 ordinance. The zoning ordinance became effective in May, 1923. The Zoning statute became effective July 1, 1923, and, as we have seen, it abolished every board of appeals theretofore appointed under the act and did not make it obligatory upon the council to appoint another board ·of appeals. Appellee contends it had no notice or suspicion appellants had not obtained proper authority to build the stable, and that appellants purposely and fraudulently concealed that fact from appellee. We have considered the testimony on both sides upon that subject and can not escape the conclusion that appellee did know no authority had been obtained by appellants to construct the building for use as a stable for more than eight horses. After

appellee concluded to dispense with the use of horses in its trucking business and (with certain conditions) agreed to accept the building as it then was, as we understand, it was not proposed by appellee to stable horses in the building, but the parties could not agree upon the terms of the lease and appellee refused to accept it. The president of appellee testified that after they had agreed upon a settlement and appellee was to take the building as it then was, appellants insisted on appellee being responsible for the building complying with the ordinance, and appellee refused to permit such a clause in the lease. The witness testified that early in June, Lewis, the beneficial owner of the property, and the witness, had a talk about a settlement; that Lewis said he had either leased or sold the building to the Hines Lumber Company, but would arrange with that company to withdraw if appellee wanted to buy the building. The witness told Lewis appellants were obligated on the original contract and that appellee would insist on their going through with it. The witness testified he was willing to sign the lease drawn by appellant, with the clause "and to make all alterations necessary to comply with the city of Chicago ordinances" stricken out; that in March, 1925, he was willing to take the building as constructed but was not willing to assume responsibility of the ordinance for the construction of two doors and a chimney. The witness further testified that appellants sent him a form of lease prepared by them after the settlement agreement in March, 1925, after appellee had sent appellants a lease prepared by it, and that he became suspicious that something was wrong in reference to assuming the obligation of compliance with the city ordinances and refused to sign it; that when he learned later the reason for inserting the clause in the lease he was willing now to sign it. He testified he was told by Wyman that the reason for inserting the clause in the lease was that a stable was not supposed to be built in that neighborhood; that he would have been willing to

sign the lease without any stalls for horses in the building. He never communicated that fact to appellants or any representative of theirs.

Appellee must be presumed to have known when the contract of August 1, 1924, was made that it was in violation of the zoning ordinance, which made it unlawful to construct a building to use for stabling more than eight horses. The contract did not expressly require appellants to secure a modification of the ordinance. Appellee's position is that as appellants agreed to construct the building they assumed the obligation of obtaining lawful authority, and that could only have been done by securing through the proper authority a modification or variation of the ordinance. To enforce specific performance there must be a legal contract, clear, unambiguous and complete in its terms, and it must be clearly proved. Granting or refusing the relief of specific performance is a matter of discretion, to be exercised by a court of equity with reference to equitable considerations incident to each case. Where the contract is fair and valid the relief will be awarded as a matter of right, but the contract must express the terms agreed upon. These general principles, we believe, are so well understood as not to require the citation of authorities.

The parties to this case about March, 1925, thought they had agreed upon a settlement by which appellee was to take the building as it then was, but when each prepared a lease as they respectively understood the settlement, neither would sign the lease as prepared by the other. As we have seen, it was not stated in the contract of August 1, 1924, that either of the parties assumed responsibility for compliance with the ordinance. That was the contract appellee asked to have and the chancellor decreed should be specifically performed. As it called for a building to stable more than eight horses it was in violation of the zoning ordinance and could not be enforced as made. An amendment or variation of the ordinance permitting the con-

struction of the building so as to permit its use for the purposes for which the contract called would have to be obtained from the city.  The city was not obligated to grant the permission if applied for, and it was for it to determine whether it would do so or not.  Under the Zoning statute of 1921 a board of appeals could recommend amendments or variations, but the change could only be made by ordinance.  By the 1923 statute boards of appeals theretofore appointed were abolished.  That act authorized but did not make the appointment of a board obligatory.  A board of appeals, if appointed under the act of 1923, was given power, when there "are practical difficulties or unnecessary hardships" in carrying out the ordinance, to vary or modify the ordinance relating to the construction of buildings "or the use of the land, so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice be done."

We are of opinion that the contract of August 1, 1924, cannot be specifically enforced.  Granting appellee's contention that by the contract it was appellants' obligation to construct a building for lawful use for appellee's purposes, appellee knew that could not be done unless a modification or variation of the ordinance was made.  Such modification was not required to be made by the city or by the board of appeals as a matter of right, upon application.  Appellee knew that to lawfully construct the building would depend upon the law being changed, and that whether that could or would be done depended upon whether the city would consent to the change.  If the change had been requested and had been refused the situation would have been the same as if none had ever been asked.  The contract could not be enforced as written because it called for an unlawful structure.

We do not see how the so-called "settlement agreement" that appellee was to take the property as it then was can affect the question of enforcing performance of the origi-

nal contract.  Appellee's president testified at the trial that he was willing to take the building without stable equipment when he learned stables could not be put there, which was after the taking of testimony began.  He said after he had refused to sign the lease prepared by appellants he found out the reason for insisting the clause he objected to be inserted and would have been willing to sign.  He was told the reason for including the objectionable clause in the lease was the "stable was not supposed to be built in that neighborhood."  He said he would sign the lease without any provision for stabling horses in the building, but he never communicated his willingness to sign it to appellants. We are convinced from the testimony that appellee's change of mind about signing the lease was not altogether influenced by a misunderstanding of the purpose of the objectionable clause.  At any rate, the appellee never notified the appellants of its willingness to sign the lease until its president so testified as a witness at the trial.  The property was conveyed by the holder of the legal title by deed dated June 5, 1925, approximately two months after appellee had refused to sign the lease and after notice to appellee that unless it complied with the contract the trustee bank would consider itself excused from performance. The bill was not filed until July 7, 1925.

To our minds, in addition to the well known cases laying down the general rules governing specific performance above referred to but not cited, *Westphal* v. *Buenger*, 324 Ill. 77, is decisive against the specific performance of the contract.  In that case the court *inter alia* said: "By the averments of the bill it appears that appellant contends, either that appellees were to procure these mortgage loans, which were to be assumed by appellant, or to aid him in so procuring them.  The language of the contract does not justify such a construction.  While such may have been the intention of the parties it does not appear from the contract.  A written contract is one which is all in writing, so

that its terms and provisions can be ascertained from the instrument itself. [Citing authority.] To entitle a party to specific performance the contract must be clear and certain in its terms and be admitted or proved with a reasonable degree of certainty. [Citing authorities.] An agreement in writing which does not purport to give an absolute right without further negotiations thereon cannot be specifically enforced."

In our opinion it was erroneous to decree specific performance of the contract, and the decree is reversed.

*Decree reversed.*